UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CT-3188-BO

| | | |
|---|---|---|
| MARSHALL FONTANA WIGGS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| BUCK WILSON, et al., | ) | |
|     Defendants. | ) | |

Plaintiff Marshall Fontana Wiggs (hereinafter "Wiggs" or "plaintiff"), a state inmate, filed this civil rights action pursuant to 42 U.S.C. § 1983. Now before the court are multiple motions. Defendants Muhammad Wasi Haq, Robert Hardy, Archie Malloy, Patrica Purnell, and Buck Wilson have filed a motion to dismiss for failure to state a claim and alternatively motion for summary judgment [D.E. 48]. Defendants Earl Butler, Lieutenant Ivy, John McRainey have also filed a motion for summary judgment [D.E. 54]. Plaintiff has filed a motion for a Rule 56(f) continuance[1] [D.E. 59], a motion to compel discovery [D.E. 63], another motion for appointment of counsel [D.E.64], and a motion to amend the complaint[2] [D.E. 66]. Responses to the motions were filed by the proper parties as to the pending motions, and the motions are ripe for determination.

---

[1] The court assumes this is a Federal Rule of Civil Procedure Rule 56(d) motion given former Federal Rule of Civil Procedure 56(f) is now located at Federal Rule of Civil Procedure 56(d).

[2] The motion entitled "motion to amend" is, in reality, a motion to reconsider the denial of a prior motion to amend to include two additional defendants, Corporal Hudson and Officer Smith. See Motion to Amend [D.E. 66] ("Therefore, Plaintiff prays that this court will reconsider it's decision and allow Cpl. Hudson and Officer Smith to be included as defendants in this case.")

i.  Issues and Factual Outline

Wiggs alleges that prior to incarceration within the Department of Public Safety for North Carolina his "back had been broken in seven different places." Compl. at 5. On September 26, 2009, while incarcerated at Cumberland County Detention Center ("CCDC") he alleges he was attacked by another inmate and "twisted and re-injured [his] back." Id. Thereafter, plaintiff contends that staff would not provide him with a stretcher, only a wheelchair, improperly examined him, mocked and ignored him. Id. at 5-6. He contends he was never given an MRI or other required care resulting in ongoing numbness in his legs and can no longer walk. Id. at 6-7. In the attachments to the complaint, he states he was treated like "an animal" even though he was in great pain and had broken his back. Id. at 14. He contends that he wrote letters and requested care from multiple administrative defendants to no avail. Id. at 7.

During the course of Wiggs' incarceration at CCDC, the medical records and medical affidavits show the following. Dr. Haq was the full-time CCDC jail physician and medical director of the CCDC medical office who examined Mr. Wiggs regularly. (Haq Aff. ¶¶ 3-4, 10.) Dr. Haq reviewed and evaluated the results of any outside referrals or testing Wiggs received while incarcerated. Id. Wiggs also had regularly scheduled appointments with Dr. Atwater, a psychiatrist who treated Wiggs' mental health issues. Id. ¶ 11. Wiggs was examined more than twenty-five times by in-house CCDC physicians while incarcerated. Id. ¶¶ 10-11.

In addition to the CCDC physicians, Wiggs received regular examinations and treatment from other members of the CCDC medical staff. He was examined by, or received treatment from, the medical staff well in excess of fifty times during his incarceration. (Haq Aff. ¶ 12; see also Purnell Aff. ¶ 30; Hardy Aff. ¶ 2.) Wiggs received pain medication, mental health services,

and other medication throughout his incarceration. Among other medications, Dr. Haq and Dr. Atwater regularly prescribed naproxen, ultram, motrin tylenol, flexeril, celexa and cymbalta. (Haq Aff. ¶ 13.) These medications were administered to Wiggs as ordered, except in instances when Wiggs refused to take his prescribed medication or refused treatment altogether. Id.

During his incarceration, when the care he required could not be provided in-house or Dr. Haq desired a second opinion, Wiggs was referred to specialists outside CCDC. (Haq Aff. ¶ 14.) Wiggs regularly displayed erratic, argumentative, uncooperative, and at times belligerent behavior toward the medical staff. (Haq Aff. ¶ 6.) He refused treatment from Dr. Haq and other members of the medical staff more than fifty times while incarcerated, including a period of several consecutive months. (Haq Aff. ¶ 19 & Ex. A.) His refusal of care was often accompanied by insulting and defiant behavior. (Id.)

On September 29, 2009, Wiggs was involved in an physical altercation with an African-American inmate, Michael Simmons, in one of CCDC's housing pods. (McRainey, Aff. ¶ 4-11). The officer in close proximity to the altercation interceded and called for back -up assistance which came immediately. (Aff. Martin ¶ 7). The officers also called for medical assistance, not because there appeared to be any significant or obvious injury to Wiggs (Donnie R. Hudson Aff. ¶ 7; Branford Ivey Aff. ¶ 8), but because CCDC policy requires such medical assistance in the event of such a disturbance. (Branford Ivey Aff. ¶¶ 6-7; Harley T. Fries Aff. ¶¶ 7-9 & 12; Joanna F. Martin Aff. ¶¶ 8-9; and Donnie R. Hudson Aff. ¶ 13). After the altercation, Wiggs was highly aggitated, aggresive, and he stated that his back was broken. Id.

Nurse Patti Purnell went to the pod to examine Wiggs. (Purnell Aff. ¶¶ 2-3.) Upon arrival, she saw several detention officers removing inmate Simmons from the pod. Id., ¶¶ 2- 8.

3

She walked into the pod and observed Wiggs standing in the visitation area of the pod screaming at the detention officers. Id. Wiggs sat down on a stool. Id. A few seconds later, he slowly and gently lowered himself to the floor, laid on his back and kept saying that his back was broken. Id.

Nurse Purnell was hesitant to approach Wiggs because he appeared to be agitated and angry. Id. ¶¶ 9-13. He continued to shout at her as she approached him. Id. Because he appeared irate and physically violent, Nurse Purnell did not feel that it was safe to get close enough to touch him to perform any sort of examination. Id. She did, however observe Wiggs, and she states did not see anything which required emergency treatment. Id. She left the pod to get the vitals machine from the medical office area. Id. At that point, Dr. Haq explained to her that it was unnecessary to take the inmate's vitals signs in the pod. Id. Rather, Dr. Haq wished to examine Wiggs in the treatment room. Id. Nurse Purnell returned to the pod and informed the detention officers of Dr. Haq's directive. Id. ¶¶ 13-16.

The detention officers brought a wheelchair for Wiggs. (Smith Aff. ¶¶ 20-23; Ivey Aff. ¶¶ 12-14; Hudson Aff. ¶¶ 16-18; Martin Aff. ¶ 14). After a struggle between the detention officers and Wiggs, the detention officers were successful in getting Wiggs into the wheelchair. (Purnell Aff. ¶¶ 17-21; Martin Aff. ¶ 14; Smith Aff. ¶¶ 8-20; Hudson Aff. ¶¶ 16-18; Fries Aff. ¶¶ 15-16; and Ivey Aff. ¶¶ 11-14).

Approximately 30 minutes after the September 29, 2009 altercation, Dr. Haq performed a thorough examination of Wiggs, including an examination of his back. Dr. Haq concluded that he had a "back strain/contusion—no evidence of bony injury," and prescribed several painkillers. (Haq Aff. ¶ 17 & Ex. A.) A few days later, Dr. Haq performed a follow up examination, during

4

Case 5:11-ct-03188-BO   Document 68   Filed 08/16/13   Page 4 of 11

which Wiggs stated that he did not "trust the jail nursing staff and physicians and wants to see another physician on the outside." Id. ¶ 18 & Ex. A.

On November 30, 2010, an x-ray of Wiggs' back was taken. Dr. Haq reviewed the x-ray, determined that Wiggs' condition was stable, and concluded that there was no reason to alter the treatment plan. Id. ¶ 20.

On July 28, 2011, upon referral by Dr. Haq, Mr. Wiggs attended an appointment with Dr. James A. Mitchell, an outside doctor. Id. ¶ 21-24. Wiggs refused to be examined, but Dr. Mitchell performed a thorough review of his chart, which included records of his back treatment prior to his incarceration. Id. He then prepared a detailed note, which concluded:

> O: Pt ambulated well with no evidence of weakness or pain. Was able to twist at the waist to point to nurse Robert and wave his arms in anger without any apparent distress. Also did the same motion when speaking to the custody officer about refusing to be seen. No other exam possible as pt refused to be seen.
>
> A/P: Chronic back pain – Pt has had no neuro symptoms or neuro findings since initial injury in 2005. At this point pt does not even seem to have significant pain as he is refusing all pain medications. From the review of the record and watching him ambulate and demonstrate his ability to twist easily at the waist I do not see any indication for surgical intervention. I agree with the management and NSAID's and possibly flexeril as prescribed by Dr. Haq.

Id. Dr. Mitchell concurred with Dr. Haq's assessment and treatment plan. Id. ¶ 22-24. In late 2011, Dr. Haq referred Wiggs to Dr. Venugopal M. Gadipudi, a neurologist. As recommended by Dr. Gadupudi, Wiggs was sent for an MRI, which he received on December 12, 2011. The results of the MRI (1) showed Wiggs' condition was stable and had not changed during his incarceration and (2) confirmed Dr. Haq's treatment plan. Id. ¶ 25. Dr. Haq also called upon the expertise of the Cumberland County Health Department ("CCHD") to review and evaluate

5

Wiggs' care. CCHD Medical Director Dr. Tran-Phu was kept abreast of, and consistently approved, the CCDC medical office's treatment plan for Wiggs. Id. ¶ 26.

ii.     Summary Judgment

Because the court considers matters outside the pleadings, defendants' motion shall be considered as one for summary judgment. Fed. R. Civ. P. 12(d). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party who seeks summary judgment must first demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted).

In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. Anderson, 477 U.S. at 252. "[T]here must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Id. The court may rely on the medical affidavits and prison medical records in ruling on a motion for summary judgment. See generally, Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998); Marshall v. Odom, 156 F.

6

Supp. 2d 525, 530 (D. Md. 2001); Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982).

To establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

Deliberate indifference requires that a defendant knew of and purposefully ignored "an excessive risk to inmate health or safety . . . ." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "[O]bduracy and wantonness, not inadvertence or error in good faith, . . . characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. "[T]o establish a claim of deliberate indifference to [a] medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Here, the records shows that Wiggs received continued care for his back concerns, as well as, multiple medical issues. The medical records clearly indicate that Wiggs was seen within 30 minutes of the altercation on Septmeber 26, 2009. Records also indicate that any delay between the altercation and medical attention was the direct result of his own behavior. The medical

7

record further shows that multiple doctors examined, or tried to examine, Wiggs throughout the course of Wiggs' incarceration at CCDC. The record also show that the guards attempted to bring Wiggs to the medical department and that Wiggs was not compliant and highly agitated. Lastly, the medical records do not indicate that his back was in fact broken, but extensive examination and testing has been done to determine this.

Thus, this claim appears to be at most a disagreement between medical professionals on the appropriate course of treatment. Such a disagreement does not reflect deliberate indifference. See, e.g., United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011); Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005).

Furthermore, the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 824, citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Likewise, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Id. at 829; see also, Helling v. McKinny, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976).

However, "not every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). "Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Beers–Capitol, 256 F.3d at 125. It is not sufficient that the official should

8

have known of the risk. Id. at 133. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. Here, there is no indication that the guards were somehow delinquent in their protection of Wiggs.

Lastly, a § 1983 action may not be grounded upon a respondeat superior theory. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Several defendants, Buck Wilson, as the Public Health Director, Archie Malloy, as the Director of the CCDC Medical Staff, and Earl Butler, as Sheriff, appear to be named in an administrative or supervisory capacity. A supervisor may be held responsible for a subordinate's unconstitutional act only if the supervisor was involved personally or participated in the unconstitutional act. See, e.g., Iqbal, 556 U.S. at 676. Thus, a plaintiff must show that (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) the supervisor responded so inadequately "as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "there was an affirmative causal link between the supervisor's inaction" and plaintiff's alleged constitutional injury. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994) (quotations omitted). Thus, the claims fail on these grounds as well.

iii. Discovery Motions

Several of Wigg's motions seek general discovery. See Motion for Rule 56(f) Continuance and Motion to Compel Discovery [D.E. 59-60 and 63]. "As a general rule,

summary judgment is appropriate only after 'adequate time for discovery.'" Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Under Rule 56(d), a court may delay ruling on a motion for summary judgment if the nonmoving party requires discovery to identify "facts essential to justify the party's opposition." Crawford-El v. Britton, 523 U.S. 574, 599 n.20 (1998) (quotation omitted); Nader v. Blair, 549 F.3d 953, 961-62 (4th Cir. 2008); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 n.2 (4th Cir. 2004). "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery." Young v. UPS, No. DKC 08-2586, 2011 WL 665321, *20 (D.Md. Feb. 14, 2011). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" Scott v. Nuvell Fin. Servs., No. JFM-09-3110, 2011 WL 2222307, *4 (D. Md. June 7, 2011). A non-moving party's Rule 56(d) request for discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995).

Here, defendants have provided a substantial amount of discovery in the motions for summary judgment. Therefore, the motions for discovery found at D.E. 59 and 66 are DENIED

iv.  Conclusion

Defendants' motions for summary judgment are GRANTED [D.E. 48 and 54]. Wiggs' discovery motions are DENIED as set out above [D.E. 59 and 66]. Having so determined, all

10

other pending motions [D.E. 63 and 64] are DENIED as MOOT. The Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this the 15 day of August 2013.

*signature*
TERRENCE W. BOYLE
United States District Judge